Plaintiffs' Co-Lead Counsel et al. v. Anheuser-Busch Companies, LLC, Arguments Not to Exceed Fifteen Minutes per Side, and Mr. Boxer for the appellants. You may proceed. Thank you, Madam Clerk. Good morning, Your Honors, and may it please the Court. My name is Joshua Boxer, and I represent the plaintiffs in this matter. I've asked the Clerk to reserve five minutes for rebuttal. You may. Thank you. Your Honors, this case concerns the functional ingredient in beer, alcohol, and whether the intentional misrepresentation about alcohol content gives rise to liability under state consumer protection and warranty statutes. And while the District Court dismissed this case, that decision should be reversed for three reasons. First, Your Honors, the defendant A.B.'s claim that the more specific beer tolerance regulation displaces more general consumer protection statutes cannot be reconciled with the U.S. Supreme Court's recent Palm Wonderful decision. Number two, consistent with Palm Wonderful, plaintiffs' claims should proceed even if Section 7.71 permitted intentional misstatements of fact. And likewise, even if A.B. fully complied with the tolerance regulation, plaintiffs' warranty claims should proceed because whether... Or it sounded like you're only claiming now under the state provision, various state provisions. Is that correct? Well, Your Honor, by virtue of the 21st Amendment and the FAAA, the implementing regulations, the tolerance regulation that's at issue here, Section 7.71, is only applicable because it was adopted by each of the states here. So we've referred to... So it was affirmatively adopted by the states, correct? Some of the states have affirmatively adopted it. They've expressed in the statutes or in the regulations, we hereby find that a brewer must conform to TTB regulation 7.71. Others have merely required a statement of labeling compliance, what they call a COLA, from the TTB. So they've adopted those regulations by implication. The states could, if they wished, have adopted their own regulations that said the tolerance level is less or that you may not intentionally use the tolerance level? That's my understanding, yes, Your Honor. And none of them have? Correct. None of the states had issue here, Your Honor. Almost all the beer companies use the tolerance as their standard? Your Honor, we do not know that. The only manufacturer that we're aware of that intentionally misstates the alcohol content is Anheuser-Busch. But presumably they do, all of them. We don't know, but it's open to them. They want to use it, fine. Whether they comply with the regulation or whether they, as one would assume, try to give consumers exactly what's on the label, that's our assumption. The only brewer we're aware of that deliberately overstates the alcohol content is Anheuser-Busch. Is there anything that would keep a competitor from putting on the label, we could understate it by up to .3, but we don't, and make an affirmative allegation that you're getting every bit of alcohol that you're buying? I'm not sure, Your Honor, if that's possible. I know that some of the language on the label would need to be approved by the state regulators, but presumably a brewer could say, unlike these other guys, we are giving you exactly. There's nothing that you know of that would affirmatively prevent that? Not that I know of offhand, Your Honor. Who exactly is being harmed by this? Oh, the consumers, Your Honor? Explain how they are being harmed exactly. Sure, Your Honor. What Anheuser-Busch has done, as in the Losky case we have cited, is attempted to use a tolerance as a piggy bank rather than a cushion for error. In the Kwikset case that we have cited in our papers, the California Supreme Court, addressing very much that same issue, Your Honor, indicated that labels matter and that for every consumer who purchases a product based on the representation of fact and gets something different, the court said that this economic harm, the loss of real dollars from a consumer's pocket, is the same whether or not a court might objectively view the product as functionally equivalent. So these consumers are very much being shortchanged, Your Honor. They expect one thing and they're given another. They have a number of choices. You mean it's three-tenths of one percent less or more? Oh, no. Anheuser-Busch consistently shoots for three-tenths lower than what they state on the label. That's right, Your Honor. But it could go either way. Well, it could, and what one would expect is for a brewer to try to hit exactly what they're saying on the label. You might expect some variation a little bit above and a little bit below. If that's truly their target. But that's not what we're talking about here. So then why does the feds give you the .3? Well, we believe that there should be, you know, all manufacturing is inherently imprecise to some degree. So the federal regulators have determined or determined many years ago, before the time that Anheuser-Busch developed this technology, that three-tenths of a percentage should be the tolerance regulation. The buyer, in general, if he or she knows about the regulations, which probably most of them don't, knows that anybody's beer may be under so that what, it takes 21 beers to get the same buzz that you should get with 20? Isn't that about the? Well, the analogy that we've been discussing, your honors, is that if you purchase 92-octane gasoline, premium gasoline, and you receive the regular gasoline, you're going to be pretty upset about it. But what we're talking about here is actually, by a percentage, as a percentage basis, an even greater deception. So this is real dollars and cents, and Anheuser-Busch knows full well that consumers find this information important. We know that. Presumably the reason for the rule or regulation here is that it's hard to hit the percentage of alcohol right on the nose every time you prepare a batch of beer, so that it's just a tolerance. I assume that's the reason behind it. I think your honor is correct in some respect, which is that there is an appropriate reason to have a tolerance regulation so that there is somewhat of a cushion of error. But the expectation is and should be that a brewer will use best efforts to target and use a tolerance as it's intended, as intended by, for example, the Handbook 44. But if that's what you say everybody thinks it ought to be, why isn't it in the regs? And that is they know how to write regs to say unintentional. They do it in some other places, right? They do know how to write regulations, your honor. But let me point out that the Supreme Court rejected exactly that type of speculation in the Palm Wonderful case. That was with respect to the Lanham Act and a suit by a competitor, right? It wasn't a consumer. That's correct, your honor, but the same reasoning applies here. The Supreme Court, particularly as it relates to what it was that the TTV must have had in mind, or the FDA had in mind, and the court specifically rejected the notion that the FDA must have considered but rejected imposing liability on Coca-Cola for that consumer practice. And we think the same reasoning applies here, and the court should adopt the approach of the Supreme Court in Palm Wonderful, which is to permit both where two regulatory schemes apply to the same conduct, to permit both of them to permit to apply both of them unless it would require inconsistent behavior. Counsel, with respect both to Palm Wonderful and to the point we haven't mentioned yet, which was the judge's statement in his opinion that everyone had agreed below that if the federal regulation was okay, the interpretation was okay, that was the end of the case. Was there a reason you didn't file a Rule 59 motion or some other motion both to raise Palm Wonderful and to attack this statement that you now attack that you had conceded the state law point? Was there any reason you didn't file either a 59 or some other motion? Your honor, we didn't file a Rule 59 motion as we didn't. We had intended to appeal the district court's decision on a number of grounds, some of which would have been applicable per Palm Wonderful. But we do know that Rule 59 is not jurisdictional. We believe that we preserved all of these issues below by arguing that even if AB complied, it still remains liable. AB addressed this issue below, and further, even if this court were to find that the issue was not preserved below, this court can and should consider this issue now. May I briefly sum up, your honors? In that this was an issue that is legal, not factual. This issue was fully briefed below, and it concerns a decision that was not reached until after. One other quick question. I heard you say a California case, and it sounded like Kwikset. Yes, your honor. That's cited in your main brief. I was looking through here and didn't see it. It is, your honor. It may be in our reply, but I have the site handy. Can you give me that? It is 51 Cal 4th 310, and that's 2011. From the name, it sounds like that's not a beer case. It's a concern. It's not. It concerned Kwikset locks. Right, that's what I thought. Right. Okay, just wanted to make sure I heard it right. Thank you, counsel. Thank you very much, your honors. You'll have your remaining time for rebuttal. Good morning. My name is Ed Crane, representing Anheuser-Busch in this appeal. There is one issue before the court, properly on appeal. All else was conceded below. And that issue is whether the district judge appropriately interpreted Section 7.71C1, what we have called the ABV tolerance in this case, to allow any brewer, not just Anheuser-Busch, any brewer, that latitude in making its product. And, in fact, Judge Nugent in the district court below gave the statute its plain meaning in accordance with the terms as they are commonly understood. There were arguments advanced that there was ambiguity in the tolerance. Judge Nugent rejected those arguments. I'm sorry. When you said ambiguity in the tolerance or in the definition of tolerance? In the definition of tolerance. Because there's no tolerance is .3. Better said, your honor. Thank you. Better said. But to get right to it, Judge Nugent scoured the record and everything that was submitted to him on that point and concluded that nothing in the record supported the definition of the word tolerance as a term of art. And although it was a straightforward analysis that he conducted, meaning the language means what it says and says what it means, in the fulsome memorandum opinion and order he considered all of the arguments that were directed to what was an attempt to create an intent-based exception to the tolerance. So Judge Nugent appropriately applied the tolerance in an intent-neutral manner as it is written, clearly written, he found, according to its plain meaning and concluded that, as conceded by the plaintiffs below, that any beer produced that falls within the tolerance range of 0.3% of either side of the amount stated on the label complies with the TTB regulation. So the TTB in this circumstance chose a purely quantitative tolerance, purely quantitative. And the test for compliance is binary. The beer gets tested. If the amount of alcohol by volume falls within the tolerance range, the beer complies. If it does not, the beer does not comply. Is there anything peculiar in this case because it is alcohol subject to the 21st Amendment as opposed to other consumer labeling laws? The answer is that I don't know that I would deem it a peculiarity, Your Honor. I would deem it something a little bit different than perhaps the Court traditionally sees in cases that come before it dealing with the FDCA and other statutes which contain preemption provisions in them. This is not a federal preemption ruling by the district court. In this circumstance, what happens is there is coordinate regulation by the federal authorities and the state authorities. And that parallel coordination arose from the repeal of prohibition and the adoption of the Federal Alcohol Administration Act. And then each state thereafter decided whether it would remain dry, whether it would adopt its own regulations. But each state involved in this case, and there are eight states, created their own Department of Alcohol Beverage Regulation. What has happened is those departments look to the federal standard, particularly on the ABV labeling. You say they look to, they're not required to. They're not required to, but they do. Do you agree with the conversation I had with your colleague that if they thought this tolerance was a bad idea, they could have done something different? Yes, Your Honor. In fact, the regulation itself, 7.71, says that. It says that. So they could have, but they did not. And do you agree we had the other conversation about whether competitors could claim or state correctly that they were being more precise than the tolerance? I guess I had in mind there used to be ads by Hebrew National that said, well, the federal government says that all beef hamburger, all beef hot dogs can have all sorts of stuff in it, but we don't. So if you wanted real all beef, you could buy theirs. Is it the same thing with alcohol? I'm going to give you a little bit of a longer answer to that short question, and I warn you up front about that. The answer is that in order for any competitor to make that statement on a product label or, as a matter of fact, in its advertising or packaging, which is also regulated by the TTB, certainly on the label, if it were to put that on the label, just as you articulated it, Your Honor, that language would have to be approved by the Tax and Trade Bureau because the Tax and Trade Bureau pre-approves every label for alcohol beverages. So the answer to your question is, will the Tax and Trade Bureau let them do it? Nobody's tried. Not to my knowledge. Okay. The reason that I said it might be a longer answer is because the alcohol beverage by volume labeling regulation actually grew out of a challenge by Coors to a prior federal policy which disallowed any statements of alcohol beverage labeling on products. And Coors sued, and ultimately it went to the Supreme Court, and the Supreme Court found that it was a violation of the First Amendment commercial speech doctrine to preclude statements of alcohol beverage. So I just offer that as some background for you, Your Honor. I don't know what the TTB would say to that. Thank you. I'm not the federal regulator. But that's what would have to happen in terms of the process. So we believe that Judge Nugent, in giving the tolerance its plain, ordinary meaning, did exactly what he should have done. Any studies by the federal agencies or the state agencies about other brands besides the Ann Hara Bush brands? Yes, Your Honor. And for purposes and for the convenience of the court, at footnote four of our district court brief in support of the motion to dismiss, which I think is page 196 in the record, we cited all of the links to the TTB website that deal with, not all, because there are lots, but the important links to the TTB website that deal with something called the Alcohol Beverage Sampling Plan. TTB began that plan in 2008. And it goes out into the market every year, and it randomly takes off the shelves malt beverages, beer, liquor, and wine. And then it subjects those samples that it's taken to tests in its own laboratories. And it discloses the tests that it uses. And it also has a definition in the material that's in all of that that has a binary test for compliance with the ABV standard. So if the ABV is above the amount stated on the label by more than 0.3 percent, the product is not in compliance. And if it is more than 0.3 percent below the ABV stated on the label, it is not in compliance. And then what, according to these documents, what the TTB does is it exercises its regulatory authority with regard to these products. So if it's a brewer, it contacts the brewer and says, hey, what's going on here, and what's wrong with your processes? But importantly, it publishes an annual report of what it does. And it breaks it down into the three categories of beverages, beer, wine, and spirits. I'm sorry, spirits is a technical term. And says we tested X samples of spirits, we tested X samples of beer. These are the ones that complied, these are the ones that didn't. And it also goes beyond just ABV testing, Your Honor. It tests for compliance on the labels of all statements with TTB regulation. It doesn't sound like you're quite getting to answering what I understood to be part of the question was, does it say on average Anheuser-Busch comes in 0.29 under and Coors comes in only 0.1 under and Flying Dog comes in over? It doesn't say that. It does not. Okay. And I did not mean to avoid the question. So it tests for compliance, but not for how close you come to the label. Correct. And I apologize if I got caught up in the minutiae, Your Honor. It doesn't state the precise answer on the various and sundry. No. It's a generic representation. It's either in compliance or it's not. That's right. And it doesn't identify any specific manufacturer of any alcohol product by name. So it doesn't. So it's not like the FAA where it says Southwest is on time 87% of the time and Delta, but it does test. It does test. And really they're not challenging that you're not in compliance with the tolerance, I guess. That's correct. That was also conceded in the trial. They just think that it's an intolerant tolerance that you're using here. Yes. That's exactly correct. That's exactly correct. So with regard to POM, I'll turn to that for just a minute. We believe that the POM case, the Supreme Court opinion in POM, let me be clear on that, the Supreme Court opinion in POM, addressed two federal statutes that are not at issue in this case. And the Supreme Court found that they were complementary, that they did not conflict. No claim in this case touches upon the Food, Drug, and Cosmetic Act or the Lanham Act. Period. So the holding in POM doesn't impact this case at all. And in addition, Well, they do seem to say two statutes conflict here, the federal and the state consumer protection statutes. That's where I'm going, Your Honor. Thank you. In POM, what the court found important, or one of the things the court found important, was that neither the FDCA nor the Lanham Act had any textual provision which suggested that the FDCA was supposed to supplant the Lanham Act. Nothing in the two texts of those statutes said that. Here, in this circumstance, we have safe harbor provisions, both statutory and common law in the state systems, which say, in effect, that if you are in compliance with state law or federal law, then the provisions of the Consumer Fraud Act do not apply. So in our view, we win this case because the states have all adopted the specific tolerance, and when you give it its plain language meaning, the case the plaintiffs have brought does not survive, and because of the safe harbor provisions that exist in the state statutes. And what would you specify as being the safe harbor provisions? That is, how are they stated or cited? Let me read you a couple. Let's pick one. So let's take the safe harbor from Texas. I'm sorry. Let's take the safe harbor from Colorado. That's one of the states. And it says, in material part, that the Consumer Protection Act, quote, I'm sorry. Let me start again. The Consumer Protection Act does not apply to, quote, conduct in compliance with the orders or rules of or a statute administered by a federal, state, or local government agency, close quote. That's representative of both the statutory safe harbors and the evolution of the common law safe harbors in the state law in all the states involved here. So in summary, we believe that POM changes nothing with reference to this case. We so argued in our briefs. And we believe that the district court's opinion, applying the tolerance according to its plain language, and then after that application dismissing all claims, is correct as a matter of law. And unless the court has any other questions of me, I will sit down. Thank you, counsel. Thank you very much. Thank you, Your Honors. I would like to address a couple of points made by Mr. Crane. With respect to the safe harbor contention, first of all, as Mr. Crane has acknowledged below, there is no safe harbor doctrine under Texas law. There's a bit of a, perhaps, a Freudian slip there. The same is true for New Jersey and Pennsylvania. The states that do recognize a safe harbor provision only allow that exception in the most narrow of circumstances. So, for example, in California, the safe harbor exception only applies where another provision actually bars the action or clearly permits the conduct. And at most, Your Honors, the regulation merely fails to prohibit intentional misstatements of alcohol content within a tolerance. It certainly doesn't affirmatively authorize intentional misstatements. Counsel, how many plaintiffs are there? Your Honor, I'm not exactly – I think there are about a dozen. And is there a relationship between them? No, Your Honor. There are a couple of – there are two different actions pending in California, and then there are plaintiffs in a number of other states, I think one or two in the majority of them. These were all consolidated into the MDL? That's right, Your Honor. And is there an organization to some extent behind the bringing of these cases, financing them or something? Not so much as financing them, Your Honor, not at all. There was a group that filed at the same time, and then there were some, for lack of a better word, tag-along actions that were filed after our case in California was filed. I'd like to address another point made by Mr. Crane with respect to Judge Nugent's analysis. Judge Nugent relied on a maxim that was specifically rejected by the Supreme Court in an analogous setting. And the Supreme Court specifically found that where two statutory or regulatory – in the absence of anything specific in the legislative intent indicating that one scheme should displace the other, the maxim that the specific trumps the general simply does not apply. Rather, where two schemes cover product labeling, the proper approach is to apply both of them unless it would require inconsistent behavior. And Anheuser-Busch has never argued that it can't comply with the tolerance regulation and consumer protection statutes simply by honestly labeling its product. With respect to testing, and Judge Boggs, your question regarding what that information would actually show, I think it's quite telling that a pass-fail without indicating what the average might be would shed no light on plaintiff's claims here. And that's something the TTB could put out the same way the FAA puts out airline on time regulation performance if they wanted to. And I would encourage it, Your Honor, because what we know, it would show with respect to Anheuser-Busch. Have you sought rulemaking? I'm sorry? I said, have you – in general, most agencies, private parties can seek rulemaking. Asking them to do that. I haven't at this point, Your Honor. Because it seemed the question we had put to you earlier is, is this what everybody does? So if it came out that everybody is under, then there's no competitive disadvantage going on. It's not like there's some virtuous heavy beer maker here who's at a competitive disadvantage. I think that sort of transparency would be very good for consumers, Your Honor, because a consumer would know that Anheuser-Busch consistently shoots for three-tenths less than is on the label, and perhaps other brewers as well. That might bring the industry or make them, to the extent that there are other brewers who are doing this, it would kind of level the playing field, which we don't have at this point. The last thing, Your Honor, is that in Palm Wonderful, the – I'm sorry. With respect to Palm Wonderful, Anheuser-Busch has given no reason why the Court's rationale wouldn't apply with equal weight here when we're talking about a specific tolerance regulation and more general consumer protection statutes. They both serve multiple purposes, including the protection of consumers and competitors, and we believe that the only way to apply these two regulatory schemes in a manner that's consistent with Palm Wonderful is to permit all of plaintiffs' claims to proceed. Okay. Thank you, counsel. Thank you very much. The case will be submitted. The clerk may call the next case.